# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

REGINALD MILLNER,          :

      Plaintiff,          :
          :
          :
     v.          :     C.A. No. 12-cv-01137-GMS
          :

STATE OF DELAWARE DEPARTMENT :
OF EDUCATION, an agency under the :
State of Delaware, GLENDA :
RIEDMILLER, individually and in her :
official capacity, JOHN MOYER III, :
individually and in his official capacity, :
LILLIAN LOWERY, in her individual :     Trial By Jury Demanded
capacity, LINDA ROGERS, individually :
and in her official capacity, DANIEL :
CRUCE, individually and in his official :
capacity, MARY COOKE, individually and :
in her official capacity, and MICHAEL :
STETTER, individually and in his official :
capacity, and MARK MURPHY, in his :
official capacity only, :
          :
      Defendants.       :

## <u>FIRST AMENDED COMPLAINT</u>[1]

1. This is a case of racial discrimination leading to termination under the Equal

Protection Clause of the 14th Amendment of the United States Constitution and conspiracy to

deprive Plaintiff of his Constitutional rights, as well as retaliation for protected free speech and

petition under the Free Speech and Petition Clauses of the 1st Amendment of the United States

Constitution. It is also an action under state law for the tort of defamation, for breach of the

---

[1] <u>All new material is underscored. All deletions are in brackets. Since an Answer has
not been filed yet,this is Plaintiff Reginald Millner's Amended Complaint as of right.</u>

covenant of good faith and fair dealing, and the Delaware Whistleblowers' Protection Act.

## I. JURISDICTION

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, 28 U.S.C. §§ 2201 and 2202, and the First and Fourteenth Amendment to the U.S. Constitution. The cause of action arises under 42 U.S.C. §§ 1983, 1985, and 1986. The claims arose in this judicial district.

3. This Court has supplemental jurisdiction over the Delaware state law claims pursuant to 28 U.S.C. § 1367.

## II. THE PARTIES

4. Plaintiff is a citizen of the United States and a resident of Delaware. Unless noted otherwise, at all times material hereto, Plaintiff was an employee of the State of Delaware Department of Education. At all times material hereto he was a diligent and loyal employee who always performed his job in an exemplary manner.

5. Defendant Department of Education ("DOE") is an agency of the State of Delaware. For Section 1983 purposes, it is only joined in this action for purposes of collecting attorneys' fees and costs.

6. Defendant Lillian Lowery ("Lowery") was at all times relevant hereto the Secretary of Education, a policy making position. Upon information and belief, she resides at 115 Christina Landing Dr. Apt. 1201, Wilmington, DE 19801.

7. Defendant Mark Murphy ("Murphy") is the current Secretary of Education and is sued in his official capacity only.

8. Defendant Daniel Cruce ("Cruce") was at all times relevant hereto the Deputy

Secretary of Education. Upon information and belief, he resides at 1606 N. Jackson St., Wilmington, DE 19806.

9. Defendant Mary Cooke ("Cooke") was at all times relevant hereto the Human Resource Officer for the Department of Education. Upon information and belief, she resides at 25 S. Bradford St., Dover, DE 19904.

10. Defendant Linda Rogers ("Rogers") was at all times relevant hereto the Associate Secretary of Education. Upon information and belief, she resides at 1017 Quail Run, Camden Wyoming, DE 19934.

11. Defendant Michael Stetter ("Stetter") was at all times relevant hereto the Director of the Curriculum, Instruction, and Professional Development Workgroup. He conducted a sham investigation into allegations against Plaintiff. Upon information and belief, he resides at 402 Whitby Dr., Wilmington, DE 19803.

12. Defendant Glenda Riedmiller ("Riedmiller") was at all times relevant hereto employed as the Warehouse Manager for the DOE. Upon information and belief, she resides at 189 Blackbird Greenspring Rd., Smyrna, DE 19977.

13. Defendant John Moyer III ("Moyer") was at all times relevant hereto employed as Science Program Staff for the DOE. Upon information and belief, he resides at 570 Hemping Rd., Harrington, DE 19952.

### III. THE FACTS

14. Plaintiff began working for the DOE on or about the year 2002 as a warehouse staff person.

15. Plaintiff did an admirable job as a warehouse staff person for the DOE. His job

3

responsibilities included refurbishing and restocking science kits for various school districts in the state.

16. There were approximately 56 different types of kits that would be refurbished by the warehouse staff. Each kit consisted of different supplies to be used in science experiments as part of the educational curriculum used across the state.

17. Plaintiff was able to refurbish each of the kits from memory and rarely needed to check the assembly list when assembling or refurbishing a science kit.

18. From the beginning and throughout Plaintiff's employment, when items used in the science kits were past their expiration date, damaged, or the science kit was discontinued, the inventory would be thrown in the dumpster and taken to a landfill. This was the standard practice for all discarded or left over items, including things that were still in their original packaging and had never been used.

19. Defendant Riedmiller was responsible for determining which items would be pulled from the warehouse shelves and thrown into the dumpster. She would determine, authorize which materials would be pulled from the shelves and discarded, and then direct the warehouse staff to do so.

20. During Plaintiff's employment, the warehouse staff did not keep an accurate inventory of the materials in the warehouse. When a shipment of new stock arrived, employees would "guesstimate" the number of items that had arrived rather than take a tally of the actual numbers.

21. Employees in the warehouse did not keep track of the number of materials that were taken from the inventory to refurbish kits or the number of materials that were returned to the

4

shelves from returned, unused, or discontinued kits.

22. John Moyer ("Moyer") would also regularly take materials from inventory to use as part of the prototype science kits he designed in his position as a science program staff person. Moyer did not subtract or notate in the inventory records the number of materials that he removed from the shelves.

23. Approximately from the beginning of Plaintiff's employment, Plaintiff would see Chris Zimmerman ("Zimmerman"), a former warehouse manager, climb into the dumpster to retrieve warehouse materials that had been thrown away. Because of this Zimmerman earned the nickname "dumpster diver." Zimmerman would periodically climb into the dumpster until <u>the facility relocated to the John Collette Education Resource Center which used dumpsters that were very physically demanding to climb into and required the assistance of another person to climb out of</u> {he retired in approximately 2004}.

24. It was common knowledge at the warehouse building that once items were designated to be thrown away that those items were available for employees to take for themselves.

25. Warehouse stock that was offered to the employees thrown in the dumpster could be any material that was being thrown out, including but not limited to, boxes, bins, desks, chairs, board games, and new textbooks. Defendants Riedmiller and Moyer were aware of this.

26. Other employees would also take items from the dumpster or items designated to be thrown into the dumpster for themselves, including but not limited to, Riedmiller, Moyer, Leah Mycek ("Mycek"), Keith Wagner ("Wagner"), and Plaintiff.

27. Warehouse materials would not be thrown in the dumpster unless Riedmiller had

5

instructed the staff to do so. Typically, smaller items which were items typically used in the science kits, like rubbing alcohol, hot chocolate mix, or lemon juice, that were to be discarded were placed on a cart as they were pulled from inventory before they were thrown in the dumpster.

28. After Riedmiller had instructed that various items be discarded, Plaintiff would ask her if he could have certain items. Upon her approval, Plaintiff would climb into the dumpster and pull out those items.

29. In order to pull items from the dumpster, Plaintiff needed to have another person assist him. Plaintiff would climb into the dumpster and pass items to the other person. When Plaintiff had finished pulling items, the other person would have to hold a pole so that Plaintiff could use it to climb out of the dumpster. Typically, Riedmiller or Mycek would hold the pole for Plaintiff. Without assistance, Plaintiff would be unable to climb out of the dumpster.

30. Riedmiller would also call or send someone to let Plaintiff know that knew items were available for Plaintiff to take out of the dumpster.

31. On or about spring 2010, Riedmiller started suggesting to Plaintiff that he sell various materials that were in the dumpster.

32. On or about spring 2010, the DOE administration implemented a new policy for ordering educational materials. The new policy required that the warehouse only order shipments in large quantities which would average out to approximately three orders a year. Previously the warehouse had been able to order new materials as needed.

33. As a result of the new policy, more storage space for materials that were part of current science kits would be needed than in the past.

6

34. On or about spring 2010, Riedmiller instructed Plaintiff and Leah Mycek ("Mycek") to remove everything from the warehouse shelves that was not part of the current science kits or currently in use and put all of it in the dumpster. Riedmiller told Plaintiff and Mycek to throw out materials including, but not limited to, the chemical test kits, other expired kits, resource center books, the entire contents of the former Reading Center, VCRs, and desks.

35. On or about May or June 2010 when Plaintiff and Mycek were removing the Reading Center contents and placing them in the dumpster, Plaintiff noticed several board games that were going to be thrown away, including brand new ones. Plaintiff asked Riedmiller if he could have one of the new games that was being discarded. Riedmiller told Plaintiff that he could take the old game because she was sending the two new games to her nephew in Canada. Plaintiff told her that he was not interested in the old game and threw it in the dumpster, where it was originally intended to go.

36. Riedmiller then took the two games, went into her office, and wrapped the games in brown paper.

37. On or about May or June 2010, as part of clearing the warehouse out for additional storage, wood from a discontinued science kit sat in piles around the warehouse, waiting to be thrown in the dumpster.

38. Mycek started taking the discarded wood for herself. She asked Plaintiff to help carry the wood to her car because it was too heavy for her to lift. Riedmiller was aware that Mycek was taking the wood home rather than throwing it in the dumpster.

39. On or about summer 2010, Riedmiller instructed Plaintiff and Wagner to throw more discontinued science kits in the dumpster, which also included approximately 300 blue plastic

7

bowls which had never been used. Wagner asked Plaintiff if he could take some of the bowls from the dumpster for himself. Plaintiff asked Riedmiller's permission to climb into the dumpster to pull out bowls for Wagner.

40. After receiving permission from Riedmiller, Plaintiff went into the dumpster for the bowls. The bowls were then distributed to Wagner, Riedmiller, Mycek, and Plaintiff who each took some for themselves.

41. Riedmiller informed Wagner that in future if he wanted bowls or any other items from the dumpster that he could come directly to her and he did not need to go through Plaintiff.

42. On or about summer 2010, Riedmiller began emailing Plaintiff about minor things like being a couple minutes late for work and blind carbon copying others on the emails. Previously Riedmiller would speak directly to Plaintiff about any minor things because warehouse staff employees did not frequently check email and spent little time at computers.

43. Approximately every month, Riedmiller would ask Plaintiff about where his money came from and how he could afford certain things like a new home or car. Plaintiff would reply by asking Riedmiller if the reason that she was asking him that was because he was African-American and if she thought he was selling drugs on the side because he was black. Riedmiller would ignore Plaintiff's replies.

43a. Several times each year warehouse staff would be required to drive to various schools throughout the state to deliver materials. Riedmiller, Mycek, and Gary Shae ("Shae") all refused to deliver materials to schools in inner city Wilmington. Plaintiff would always be required to make these deliveries. After several deliveries, Plaintiff asked Riedmiller why he was the person who always had to make the deliveries to Wilmington and never to the non-inner city

8

schools in southern Delaware. Riedmiller told him that she refused to make deliveries in Wilmington. She said that it was dangerous and that "there were too many..." before abruptly cutting herself off mid-sentence. Plaintiff asked her what there was too many of and if he was being sent to the inner city schools because he was black. Riedmiller ignored his questions and did not respond. After the warehouse relocated to Dover, every time Plaintiff had to make deliveries to Wilmington he asked Riedmiller why he always to had to be the one to go and would again ask why Mycek and Shae did not have to go. Each time Riedmiller would blow off his questions and would continue to send him to Wilmington.

44. On or about July 2010, Moyer asked Plaintiff about some bottles of rubbing alcohol that had been placed on a cart to be discarded in the dumpster. Plaintiff told Moyer that if it was no longer on the cart that it would have been thrown in the dumpster.

45. On or about late July or early August 2010, Mike Stetter ("Stetter") met with all of the warehouse staff. The warehouse staff first learned of the meeting earlier the same morning.

46. Stetter informed the employees that he was conducting an internal investigation into the theft of items from the warehouse inventory. He also let the employees know that the police might become involved in the future.

47. Upon information and belief, Moyer and Riedmiller, who had both also taken discarded items from the warehouse, reported to Stetter's secretary, Jackie Edge ("Edge") that Plaintiff had taken items from the warehouse, which initiated the internal investigation.

48. On or about late July or early August 2010, Stetter and Linda Rogers met with Plaintiff. They asked him about the items allegedly missing from the warehouse. Stetter told Plaintiff that if he had anything that was missing from the warehouse that Plaintiff should not

9

bring it back into the building and that he should throw it away instead.

49. On or about late July or early August 2010, Plaintiff informed Stetter that he had some materials from the warehouse dumpster that he had taken because Riedmiller had given Plaintiff permission to have them.

{50. In conducting the internal investigation, Stetter did not interview and/or question Plaintiff about the items allegedly stolen from the warehouse}.

50. {51.} Upon information and belief, Stetter did not interview all of the warehouse employees about the allegedly stolen items. Instead he only interviewed Moyer and Riedmiller, the biases employees who initially accused Plaintiff of stealing items.

51. {52.} On or about early August 2010, Riedmiller and Gary Shae ("Shae") began conducting inventory of materials on the warehouse shelves. Their inventory was limited only to items that had been in the chemical test science kits.

52. {53.} On or about early August 2010, Wagner, Mycek, and Plaintiff conducted inventory of the remaining items in the warehouse that were part of the current science kits.

53. {54.} On or about August 19, 2010, Wagner told Plaintiff that one of the dumpsters was being taken away by the disposal service.

54. {55.} After learning this, Plaintiff went to the truck driver to ask why the dumpster was being picked up. The driver told him that Riedmiller had called the disposal service to let them know that one of the dumpsters was full and that it needed to be picked up.

55. {56.} Suspiciously, the warehouse dumpster had been picked up by the trash disposal service approximately three weeks before. It usually took two to three months for both dumpsters to become completely full. It is highly unlikely that either dumpster was full and

10

needed to be picked up.

56. {57.} Warehouse dumpsters were supposed to be picked up when both dumpsters were full. Each dumpster had a light on it that indicated when it was at capacity. When both dumpsters were full, it was Plaintiff's responsibility to call the disposal service to schedule them to be picked up.

57. {58.} On or about August 20, 2010, Plaintiff was arrested for allegedly stealing materials from the warehouse inventory.

58. {59.} On or about August 20, 2010, Plaintiff was suspended from work with {without} pay.

59. {60.} On or about September 1, 2010, Plaintiff received a letter from the DOE notifying him of the DOE's intent to terminate Plaintiff on September 17, 2010 and that a pre-termination hearing had been scheduled for September 9, 2010. Upon information and belief, Linda Rogers ("Rogers") recommended that Plaintiff be terminated after reading and discussing the investigation conducted by Stetter.

60. {61.} On or about September 9, 2010, Plaintiff attended a pre-termination hearing regarding his employment. The pre-termination hearing was conducted by Lillian Lowery, Daniel Cruce, and Mary Cooke ("the hearing board"). The hearing board told Plaintiff that the pre-termination hearing was Plaintiff's chance to present his facts.

61. {62.} At the pre-termination hearing Plaintiff told the hearing board that Riedmiller gave him permission to remove items from the dumpster. He told them that it was common practice that once items were in the dumpster or designated to be thrown in the dumpster, that they were available for employees to take.

11

<u>62.</u> {63.} Plaintiff informed the board that for years the warehouse staff had been discarding materials in the dumpsters. He said that the materials could be expired or broken but that many times the materials that were thrown in were brand new or in good condition but were part of discontinued kits and were only thrown out to make room for new items.

<u>63.</u> {64.} Plaintiff told the hearing board about the entire contents of the Reading Center being disposed of into the dumpster to make space in the warehouse in 2010.

<u>64.</u> {65.} Plaintiff said that he estimated that the amount of materials that had been thrown away in the previous few months alone at $250,000 to $300,000. He said that the practice of throwing excess materials and discontinued science kits had been going on for years and that every year the warehouse wasted thousands of dollars in discarded materials.

<u>65.</u> {66.} Plaintiff told the hearing board that several employees had taken various items too, including Riedmiller, Moyer, Zimmerman, Mycek, and Wagner but that he was the only one who was being investigated and disciplined for taking items from the dumpster. He told the hearing board that he believed that he was being treated differently than the other employees because of his race.

<u>66.</u> {67.} Plaintiff also stated that he believed that Riedmiller had chosen Plaintiff to "take the fall" for the waste and missing materials because he was African-American.

<u>67.</u> {68.} Plaintiff also brought documents to the pre-termination hearing to show the hearing board and a list of witnesses. He asked that the hearing board speak with his coworkers and investigate how warehouse materials had been disposed of for years and the assertion that other employees would also take discarded materials home.

<u>68.</u> {69.} The pre-termination meeting lasted approximately forty-five minutes. During

12

this time, the hearing board did not ask Plaintiff any questions.

69. {70.} Upon information and belief, the hearing board did not investigate Plaintiff's allegations and statements or speak to Wagner, Mycek, or any other of the employees that Plaintiff provided as potential witnesses to the hearing board regarding the information Plaintiff presented at his pre-termination hearing.

70. {71.} On or about September 15, 2010, Lowery sent Plaintiff a letter stating that the decision had been made to terminate Plaintiff's employment, effective September 17, 2010.

71. {72.} On or about September 17, 2010, Plaintiff's employment was terminated with the DOE.

72. {73.} As a result of Defendant's discriminatory and illegal actions, Plaintiff has suffered irreparable injuries, including but not limited to loss of back pay, front pay, past, present and future benefits and economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which he should be compensated.

## COUNT I - EQUAL PROTECTION CLAUSE

73. {74.} Plaintiff realleges and hereby incorporates paragraphs 1 - 72 {73}.

74. {75.} The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids unjustifiable discrimination on the basis of race.

75. {76.} Defendants discriminated unconstitutionally against Plaintiff based on his race by disciplining Plaintiff but not non-minority employees for the same offense.

76. {77.} Any non-discriminatory reasons cited by the Defendants are a pretext for race discrimination. The natural probative force of the evidence demonstrates race discrimination.

13

77. {78.} Alternatively, a reasonable fact finder could choose to disbelieve any non-discriminatory reasons offered by the defendants because the plaintiffs can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the Defendants' explanation that it is unworthy of belief.

78. {79.} Defendants' actions towards Plaintiff violate the Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1983.

## COUNT II - EQUAL PROTECTION CLAUSE RETALIATION

79. {80.} Plaintiff realleges and hereby incorporates paragraphs 1 - 78 {79}.

80. {81.} Defendants took action adverse to plaintiff as a direct and proximate result of and in retaliation for Plaintiff's complaints of racial discrimination to Defendant Riedmiller and separately to the hearing board. There is a temporal and causal relationship between Plaintiff's aforementioned protected speech and conduct, and adverse employment action. Plaintiff's complaints of racial discrimination in violation of the Equal Protection Clause of the 14th Amendment was a substantial or motivating factor in the adverse employment action. The Defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have grounds to terminate Plaintiff.

81. {82.} Plaintiff's constitutional right to freedom of speech has been denied under the 14th Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

## COUNT III - TERMS AND CONDITIONS, § 1983

82. {83.} Plaintiff realleges and hereby incorporates paragraphs 1 - 81 {82}.

83. {84.} Under all the circumstances, Plaintiff has been illegally discriminated against in terms and conditions of employment which was created, approved and tolerated by

14

management because of his race.

84. {85.} Plaintiff's constitutional right to be free of racial or national origin discrimination has been denied under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

### COUNT IV - CONSPIRACY TO DEPRIVE PLAINTIFF OF HIS CONSTITUTIONAL RIGHTS UNDER 42 U.S.C. § 1985

85. {86.} Plaintiff realleges and hereby incorporates paragraphs 1 - 84 {85}.

86. {87.} Defendants Riedmiller, Moyer, and Stetter conspired for the purpose of depriving Plaintiff of equal protection of the laws or equal privileges and immunities because of Plaintiff's race in violation of 42 U.S.C. § 1985.

87. {88.} Defendants Riedmiller and Moyer furthered the conspiracy by reporting Plaintiff's conduct to Defendant Stetter, initiating a sham investigation of theft of materials which Riedmiller gave Plaintiff permission to take from the dumpster, and obstructed the investigation by falsifying information in their interviews and inventory records.

88. {89.} Whereby as a result of the internal investigation, Plaintiff was wrongfully terminated from employment and unfairly arrested for felony theft depriving him of his right to be free of racial discrimination under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

### COUNT V - FREE SPEECH CLAUSE RETALIATION

89. {90.} Plaintiff realleges and hereby incorporates paragraphs 1 - 88 {89}.

90. {91.} Defendants took action adverse to Plaintiff as a direct and proximate result of and in retaliation for Plaintiff's First Amendment protected speech on matters of public concern

15

relating to Plaintiff's pointing out the waste associated with the disposal of hundreds fo

thousands of dollars worth of science kits and resources and his being brought before the hearing

board because of his race. There is a temporal and causal relationship between Plaintiff's

aforementioned protected speech and conduct, and adverse employment action. First

Amendment protected activity was a substantial or motivating factor in the adverse employment

action. The Defendants cannot prove by a preponderance of the evidence that absent a

constitutional violation they would have grounds to terminate Plaintiff.

91. {92.} Plaintiff's constitutional right to freedom of speech has been denied under the

First Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

### COUNT VI -DELAWARE WHISTLEBLOWERS'
### PROTECTION ACT VIOLATIONS

92. {93.} Plaintiff realleges and hereby incorporates paragraphs 1 - 91 {92}.

93. {94.} The actions of the Defendants violated 19 Del. C. §1701, *et seq.*

94. {95.} Defendants knowingly demoted, discharged, and otherwise discriminated

against Plaintiff regarding Plaintiff's compensation, terms, conditions, and privileges of

employment because Plaintiff reported verbally and/or in writing that violations of 19 Del. C.

§1701, *et seq.* had occurred.

95. {96.} Plaintiff was discharged and otherwise discriminated against because he

reported the serious deviations from financial management and/or accounting standards by

reporting Riedmiller's failing to document inventory, mismanagement of, and wasting of the

DOE's materials and inventory.

96. {97.} As a direct and proximate result of the actions of the Defendant as detailed

herein, Plaintiff is suffering from and/or is entitled to unpaid bonuses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of past and future benefits, back pay, future economic loss, front pay, humiliation, embarrassment, and other injury and non-pecuniary losses.

## COUNT VII - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - REPORTING WASTE

97. {98.} Plaintiff realleges and hereby incorporates paragraphs 1 - 96 {97}.

98. {99.} Plaintiff reported the waste and mismanagement of state property to the hearing board at his pre-termination hearing.

99. {100.} Delaware has a particular public policy interest in encouraging the reporting of waste and mismanagement of state owned property by employees. As such, there is a specific implied contractual obligation by Defendant to not terminate its supervisors who simply report legitimate waste and mismanagement of state property.

100. {101.} Plaintiff, as a state employee who worked in a warehouse where state owned materials were stored, occupied a position where he could help advance or sustain that particular public policy interest encouraging the reporting of waste and/or mismanagement of state owned property.

101. {102.} Defendants terminated Plaintiff as a direct result of his reporting the waste and/or mismanagement of state property to Stetter and/or the hearing board.

102. {103.} Defendants breached its implied obligation not to terminate an employee, namely Plaintiff, for legitimately reporting the waste and/or mismanagement of state property.

103. {104.} Defendants' breach of this implied obligation, Defendants caused damage to Plaintiff such that he was denied the fruits of his employment contract.

104. {105.} For example, as a direct result of Plaintiff's reporting of waste and mismanagement of state property, Defendants wrongfully terminated Plaintiff's employment on September 17, 2012.

105. {106.} As a result of Defendants' actions, Plaintiff has suffered irreparable injuries, including but not limited to loss of pay, past, present and future benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which he should be compensated.

## COUNT VIII - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - FALSE ACCUSATIONS IN PERSONNEL FILE

106. {107.} Plaintiff realleges and hereby incorporates paragraphs 1 - 105 {106}.

107. {108.} Defendants Riedmiller and Moyer falsely accused Plaintiff of stealing materials from the warehouse.

108. {109.} Defendants conducted a limited and sham investigation into allegations made against Plaintiff.

109. {110.} Defendants failed to investigate any of the statements that Plaintiff made during his pre-termination hearing, including that he had been given permission to have materials that were designated to be thrown in the dumpster or materials in the dumpster and that it was commonly known at the warehouse that materials designated to be discarded in the dumpster or

18

in the dumpster were available for employees to take.

110. {111.} Defendants thus placed false information into Plaintiff's personnel file and created a fictitious grounds for termination.

111. {112.} Defendants breached its implied obligation not to falsify or manipulate employment records to create fictitious grounds for termination.

112. {113.} Defendants' breach of this implied obligation, Defendants caused damage to Plaintiff such that he was denied the fruits of his employment contract.

113. {114.} For example, as a direct result of the falsification and manipulation of Plaintiff's employment records Defendants created fictitious grounds for termination and wrongfully terminated Plaintiff's employment on September 17, 2010 {2012}.

114. {115.} As a result of Defendants' actions, Plaintiff has suffered irreparable injuries, including but not limited to loss of pay, past, present and future benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which he should be compensated.

## COUNT IX - PETITION CLAUSE RETALIATION

115. {116.} Plaintiff realleges and hereby incorporates paragraphs 1 - 114 {115}.

116. {117.} The Defendants Lowery, Cruce, Cooke, and the DOE took action adverse to Plaintiff as a direct and proximate result of and in retaliation for Plaintiff's petitioning of the government by affording himself of the pre-termination due process hearing and by reporting the waste and mismanagement of state property to Stetter and the hearing board. There is a temporal and causal relationship between Plaintiff's aforementioned protected speech and conduct, and the

19

adverse action taken against Plaintiff. First Amendment protected activity was a substantial or motivating factor in the adverse employment action. The Defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have taken adverse action against Plaintiff.

## COUNT X - DEFAMATION

117. {118.} Plaintiff realleges and hereby incorporates paragraphs 1 - 116 {117}.

118. {119.} Defendants Riedmiller, Moyer, Stetter, and Rogers defamed Plaintiff by falsely reporting that Plaintiff stole warehouse materials, creating a report of an investigation into the allegations that contained information that these Defendants knew were false and/or should have known were false, and recommending termination to the hearing board based on information the Defendants knew, should have known was false, and/or with a reckless disregard for the truth.

119. {120.} The false and defamatory statements by Defendants were published.

120. {121.} As a direct and proximate result of the actions of the Defendants as detailed herein, Plaintiff has suffered and is suffering diminished earning capacity now and upon his retirement, decreased employment and earnings opportunities, and other pecuniary losses, emotional pain, suffering, disappointment, anger, inconvenience, mental anguish, loss of enjoyment of life, mental and physical pain, anguish, humiliation, embarrassment, injury to reputation, and other non-pecuniary losses and injury.

## COUNT XI - NEGLECTING TO PREVENT INTERFERENCE
## WITH CIVIL RIGHTS UNDER 42 U.S.C. § 1986

121. {122.} Plaintiff realleges and hereby incorporates paragraphs 1 - 120 {121}.

122. {123.} Defendants Rogers and Stetter had actual knowledge of Defendants Riedmiller, Moyer, and Stetter's illegal conspiracy under 42 U.S.C. § 1985.

123. {124.} Rogers and Stetter had the power to prevent the commission of a violation under 42 U.S.C. § 1985 by properly investigating the false allegations made by Riedmiller and Moyer.

124. {125.} Instead of preventing the violation, Rogers recommended that Plaintiff be terminated which resulted in Plaintiff's termination.

**WHEREFORE,** Plaintiff prays that the Court:

(a)     Enter judgment against the Defendants, jointly and severally.

(b)     Enter a declaratory judgment declaring the acts of the Defendants to be a violation of Plaintiff's Constitutional and statutory rights.

(c)     Enter judgement against Defendants for compensatory damages, including lost wages, back pay, overtime and benefits, past and future economic loss, future or front pay, loss of earning capacity, humiliation, embarrassment and injury to reputation, personal injuries, and any other pecuniary and/or non-pecuniary damages.

(d)     Enter judgment against Defendants for punitive damages and/or treble damages.

(e)     Award Plaintiff reasonable costs and attorney's fees.

21

(f)     Award Plaintiff pre- and post-judgment interest.

(g)     Enter an injunction reinstating Plaintiff to his prior position with the
Department of Education.

(h)     Issue a permanent injunction requiring the defendants to:

(I)     Notify everyone who learned of Defendants' treatment of Plaintiff that
their conduct was illegal;

(ii)    Expunge Plaintiff's personnel file of any derogatory information relating
to this matter.

(I)     Enter judgments against the individual defendants Riedmiller, Moyer, Rogers,
Stetter, Lowery, Cruce, and Cooke, separately, for Plaintiff's compensatory damages, including
emotional distress, humiliation, embarrassment and injury to reputation.

(j)     Require such other relief as the Court deems just and proper under the
circumstances.

**MARTIN D. HAVERLY, ATTORNEY AT LAW**
/s/ Martin D. Haverly

**MARTIN D. HAVERLY, ESQUIRE**
DE Bar No. 3295
1011 Centre Road, Suite 117
Wilmington, DE 19805
(302) 994-2255
Martin@HaverlyLaw.com
Attorney for Plaintiff

Dated: December 17, 2012 {September 14, 2012}